Case number 20-10-03 Tri-County Telephone Association, Inc. Petitioner v. Federal Communications Commission and United States of America. Mr. Adamchak for the petitioner, Ms. Citring for the respondent. May it please the court. My name is Kenan Adamchak and I represent the petitioner in this case, Tri-County Telephone Association, Inc. I've informed the clerk that I have reserved two minutes for rebuttal. Your Honors, I'd also like to let you know this is my first time making a oral argument. I've served as second chair in several cases before this court, but it's my first time in the hot seat. All right, we'll go easy on you then. I'm sorry, sir. We'll go easy on you. Thank you, Your Honor, I appreciate it. Well, he said that, I didn't. Your Honors, this case primarily concerns whether the FCC is permitted to expand universal service support by hundreds of millions of dollars to purposes unintended by Congress. Furthermore, this case also concerns whether the FCC is permitted to make these changes without first seeking public input regarding the impact of these changes on carriers such as TCT, who are USF contributors. TCT's arguments consist primarily of five points. First being, Section 254 of the Universal Service Fund is not a substitute for disaster relief efforts. Can I ask a question about that? Yes, Your Honor. I want to be clear so that when the next disaster occurs, we know exactly what your position is. If a fire destroys all telecommunications in Wyoming and Montana, you can get nothing out of the Universal Service Fund to replace it or to repair it on emergency or other basis. Is that the position? No, Your Honor. According to Section 254, there's nothing explicitly states that universal service can be used for disaster relief. So the position is that you could not get any money if there's a disaster in your area? Yes, Your Honor. Okay. The reason for this is, one, Congress did not explicitly state disaster relief is a universal service principle. It also, the fact that with Stage 1 funding and Stage 2 funding, it's apparent that they were using high-cost support funding for disaster relief efforts, which according to Section 254B3 relates specifically to ensuring both reasonable services and reasonable rates. Why does it, it doesn't have the word both in it, but it says should have access to telecommunications and information services that are reasonably comparable and that are available at all, then you don't have access to services. I'm not sure what reading could mean that providing access, if otherwise you get no access, isn't covered by 3. Your Honor, 3 says you need, the word, the crucial word there is and, which distinguishes services and, which says services and rates are part and parcel of the same thing. Well, but you don't get any rates if you don't get any services at all. So, if you don't have access at all, I don't, the statute provides including low-income consumers and those in rural, insular, and high-cost areas should have access to telecommunications and information services, including, I'm sorry, that are reasonable compared to those services provided and that are available at rates that are reasonable or comparable. So, it Puerto Rico has no access and Wyoming does have access. That's not comparable, is it? No, it's not, Your Honor, but in order to make sure that you're ensuring comparable services or access, you must also be considering whether or not those services are being offered at comparable rates. Wasn't the first question whether they get services at all? Yes, Your Honor, but as soon as you consider whether or not they get services, you also got to make sure under B3 whether or not they're also getting comparable rates. As the court said, as the 10th Circuit said in Quest 1 when they looked at this, they said consideration of rates cannot be divorced from consideration of access. That's under certain extreme circumstances they were talking about in Quest 1, right? They were talking about in Quest 1 whether or not specifically the definition of universal service rates. That was when they were talking about you have to consider rates. That was under certain extreme circumstances where subsidization would be so large that it would destroy the whole program. They weren't just talking about rates, period. Yes, correct, Your Honor. They were also talking about the need to balance different factors of 254B with one another, and as to whether or not rates would be so large would trigger the B5 requirement of, predictably, its sufficiency of the fund. Here, if they use universal service support for natural disasters, if it happens again, it happens again, it happens again, these are billion-dollar catastrophes affecting citizens in the United States. In the long term, it's just going to require a lot of funding, and over the long term, there's no predictability of what the next disaster costs, how much money is going to need to go to this, and the fact that more money will need to go to this by the sheer nature of the extent of the damages of these hurricanes. Where do you get all that from the statute? Where do you get all that from the statute? Tell me what in the statute supports your conclusion about disasters. What language in the statute does that? I said, it says, as Judge Garland pointed out, it says, should have access, should have access to telecommunications and information services, should have access to it. What in there says that they can't use the money to provide access to people who lose it because of a hurricane? Because B3 focuses on access at reasonable, comparable services and rates. It doesn't specifically say anything about people losing the service because, lost the service because of a natural disaster. There's nothing in the language there that says that. Suppose the people in Wyoming lose their service because their local phone company goes bankrupt? Yes. Suppose instead of Puerto Rico having a hurricane, they had lost their service because the provider, the telephone company in Puerto Rico went bankrupt. Then another carrier would have to step in and offer, become a carrier of last resort to offer services. Suppose there isn't one and the FCC decided they need to provide additional funding to provide an incentive for the new company to come in. They can't do that? I believe they could do that to offer, to ensure access, but they must also be ensuring access at services and rates. See, the problem here is disaster relief constitutes a whole separate level of funding, a new support mechanism altogether. Why? Because using disaster relief is something, is basically the restoration of ensuring that services are there and continue to be there to high cost areas. Because high cost means that these areas cost more than the average cost of services, cost of country to provide service. And so high cost provides carriers, compensates carriers for the difference between the cost of providing service and the actual rates in service. Disaster relief is something, it's so broad and Congress would have specifically considered it as a separate funding mechanism. It's so distinct from just making sure that there are services available to areas where it's very expensive to provide service. And that would trigger 254B7, where the FCC would have to have worked with federal, state, joint board of universal service to come up as funding disaster relief as a principle of universal service. That goes into my next point about the joint board. The FCC here failed to discuss, to refer the matter to the joint board about whether or not universal service support can be used for disaster relief funding. There's nothing specific in the statute that says the FCC can act unilaterally to expand universal service to disaster relief. So that argument only works if we don't agree that the principles of one through six apply, right? Correct. So if we read the statute, particularly section three, as including the consequences of disaster, then your argument about joint board, there is no argument about the joint board then, right? That is correct, your honor. The only way there would be an argument there would be if you considered funding for disaster relief to be so broad that it doesn't fall into those categories, like you said. So here, 254 does not specifically say the FCC can act unilaterally to implement universal service support, as I was saying. They have to go through and receive a recommendation from the joint board. And then the statute specifically says the FCC will consider and assess what the joint board's recommendations are. Tell me again what provision in the statute you think bars use to the universal service in situations involving disaster relief? 254B3, which states that high cost support is supposed to be used to ensure reasonable services and reasonably comparable rates. And also it does not comport with the sufficiency and predictability principle under 254B5. Natural disasters by their very nature are so broad and unpredictable that it requires such an increase in funding to continue to support these disaster reliefs over the long term. This became a billion dollar program. Hurricane Katrina in the past cost millions and millions of billions of dollars in overall damage. So those are, B3 and B5 is where it does not comport. And since it's a whole new mechanism, it would have to have been created under B7 in conjunction with the joint board. To turn to my third point, the FCC also failed here to show good cause for implementing, for suspending notice and comment prior to issuing the stage one support. They argued that the annual hurricane season was a sufficiently imminent and real emergency to justify the suspension of public input before issuing another $64 million in relief to the islands. In a sense, the FCC created their own problem here. They issued- You don't think the hurricane created the problem? Your Honor, yes, the hurricane did create the problem, but they waited eight months after Hurricane Maria. They concluded two things there. One is that access had not yet been reestablished. And second, another hurricane season was coming. Yes. To see how much greater of an emergency there ever would be. It needs to be a concrete emergency, Your Honor. It needs to be on the doorstep. If this will happen, that- Do we have to wait until there's a hurricane warning coming? Is that what you're saying? I, yes, Your Honor. I believe it needs to be sufficiently imminent. There needs to be a clear and concrete emergency. And hurricanes don't hit the islands every year. So you have to wait until either the weather service knows for sure that it's gonna hit Puerto Rico, or wait until after it hits and the disaster occurs. In a circumstance where they are already not having full access because of the last hurricane, and they still don't have full electrical power or Yes, Your Honor. If they're gonna base it on a hurricane, they would need to point to some other sort of emergency altogether to suspend notice and comment. Okay, thank you. And they also tried to suspend notice and comment on the fact that if they didn't give the money right away, carriers were gonna go out and use cheaper restoration efforts. There was nothing in the record that said that carriers were gonna do this. In fact, the comments just said, the funding you gave us in the past was good, but we need more. We're using generators. It never said, hey, if you don't give us funding, we're gonna find cheaper ways of doing this. It just said that it wasn't explicit. In what situations do you think, if any, that funds can be used where an area has access and then it is lost, not because of a hurricane, it's just lost. And so they don't have access anymore, as B3 contemplates. Can funds ever be used there? I mean, it's kind of a variant of what Judge Garland was suggesting, because you clearly have no access if it's lost. Now you're focusing on it was a hurricane. Let's make it, tell me anything that would be permissible once the service is lost. In other words, they had access and now they don't. In whatever area you wanna put it, can funds ever be used? Yes, Your Honor. Give me an example, like when? If the facilities in that area are too expensive to operate to ensure some kind of reasonably comparable level of service and- No, no, no, you're just stating the statute. I want a situation. They had access that was fine, no issues, and then something happens. I wanna know whether you think there can ever be this scenario where something happens and now they don't have that access and don't make it a hurricane. Is there any situation? Yes, Your Honor. I believe there would be when, in a sense, where it's become too expensive to operate in that area. And they need some kind of funding to bridge the gap between the cost of the carrier and the cost of the rates, ensuring reasonable rates to the consumer. Sorry about the dog. She only barks when she approves of what you're saying. Sorry. Thank you, Your Honor. But if the disaster is a business who is holding effective control over access by the rates they charge or the services they offer, suddenly jacks everything way up. So you effectively have a disaster. So access is no longer any good. That's good enough? Yes, Your Honor. Whereas a hurricane, which comes in and essentially does the same thing, unexpected, except it's a hurricane. It's not a business charging new and high or exorbitant rates. That's not okay. It's not okay. And in both situations, there's a loss of access. I don't get that. I don't know how you get that out of the language. It's because you have to read, when the FCC implements 254B's principles, you have to read it as a whole and balance everything together. All I'm trying to figure out is how you make the distinction you just made. So now I don't have access because the businesses, the people who apply services, business, they are now doing a number on us. And we simply can't manage it. So we're in a distressed situation. And we need help, as opposed to a situation where a hurricane comes in and does a disaster on us, and we need help. And you say in the former situation, business related and real, and it's a true disaster, it's okay. But in a hurricane, it's not. I don't get it. Because hurricanes are so unpredictable. Well, but business pulling a number where suddenly all of these different parts, the supplies, furnishing services, etc., are no longer what they were, unexpected. But it's there now, and there's no access. And you say that's okay, you can help them then. Yes, I believe 254 contemplated the business arrangements of the cost of providing service, because businesses all of a sudden could not face the high cost of operations in these areas, but for federal aid. Hurricane relief and disaster relief is something on a whole nother level, a whole nother greater magnitude. This was focusing on allowing a business to operate in an area because it was too expensive to operate there. Disaster relief, by its sheer size and sheer unpredictability, takes it out of that ballpark, and it becomes a whole new space. No, no, I mean, you're wanting to change my hypothetical. I'm trying to give you a situation where access was fine before, and something now happens other than a hurricane, and these people need help. And you're saying, nah, hurricane's different than any other thing I can imagine. What was your answer to Judge Tatel's question about bankruptcies? If a carrier goes bankruptcy, another carrier would have to step in, another carrier of last resort, because there always has to be a carrier providing services to these areas. What if, again, just to follow up, I'm still not from Judge Tatel's second question. Imagine there's only one carrier, it's a rural area, there's only one carrier. Nobody else is willing to go without more money. Or make it a supplier. Do they get more money? Or make it a supplier who no longer is willing to supply to the carrier. If they're not able to provide service, after federal funding, then they need to get- That's what happens when you have a hurricane. Just like either the carrier's gone, or the supplier of the carrier's gone, or the hurricane comes. You no longer can furnish the service. And we're struggling to try and distinguish one from the other. The only way you can distinguish one from the other is, one has been contemplated by Congress. Businesses, just the economics of it are not working in that area. For whatever reason, they can't service that area without support. Well, Councilman, the economics are not working post hurricane. That's why you need help. You know, let me ask you something else. You keep emphasizing hurricanes are unpredictable. And you answered in response to, I think, Judge Edwards, you said they would have to have a fair degree of certainty that a hurricane was on the way. But if you look at the commission's explanation for its good cause, it wasn't all dependent on a new hurricane. It said, given the emergency situation and the devastation to communications networks caused by the hurricane, the sooner they get more money, the sooner services can be restored. They're just saying, this is an emergency in Puerto Rico. We don't even need another hurricane to justify a good cause here. Hurricane Maria was a once in a century storm that caused devastating damage. Even after months of recovery, even after months of recovery efforts, the majority of citizens in Puerto Rico still like access to service. That has nothing to do with the future hurricane. They're just saying, hey, it's a disaster. My reading of that paragraph- That's not true. Sorry, Your Honor. My understanding is that paragraph ended up, and they said, these islands are still continuing to recover from the last hurricane. We're one month out from hurricane season. They need this money now. It wasn't because they need this money now, because they're continuing- I just read you the three sentences which say that. The final sentence connects it to the next hurricane season starting June 1st, 2018. So it's a buildup to a month out, and they need the money now because the hurricane season is going to start one month later. So ultimately, the overarching reason was the annual hurricane season. The restore- That's not the way I read it. Sure, they say another hurricane could come. New hurricane services says, and, it says, and, it says, and the next hurricane service will commence on June 1st. It's an and. Correct, that is an and, but the buildup is to the next hurricane. All right, okay. Yeah. Judge Edwards, Judge Garland, do you have any further questions? No, no, I'm okay. Okay, we'll hear from the government. Thank you, Your Honors. Good afternoon, and may it please the court. I'm Sarah Citrin for the FCC.  this case turns on the agency's side, the agency's statutory mandate to ensure access to quality, reliable communication services in all regions of the United States. I'd like to spend a little time explaining why, in the agency's view, that was a reasonable, the decision here to, in the particular circumstances facing these territories after devastating hurricanes, it was a reasonable implementation of Section 254 to decide to subsidize communications infrastructure in these regions that would be resilient to future storms. If you don't mind, I hate to put you on another topic, but I do have another interest here for just a moment. This is on the issue raised by opposing counsel about why wasn't Rule 54.7 waived and why wasn't there forbearance as there was in the Katrina circumstances. When I reread the Katrina order, it seemed to me that those waivers and forbearances had to do with things that did have to be waived and foreborn, like the lifeline rule and other rules and that in this particular kind of issue about whether it covers hurricanes was not, there was no rule before that had to be foreborn and no rule that had to be waived. Am I wrong about that? Or is there some other explanation for why it wasn't done in this case? You're correct that there was no rule that had to be foreborn with respect to the, or waived in the case of 54.7. As to the interpretation of Katrina, I'll concede that it isn't abundantly clear. I wouldn't rule out that that discussion pertained also to the high cost program, although you're quite right that the main relief in that order concerned other aspects of the universal service programs. But I would note for the court's attention that forbearance even in the Katrina order was an alternative approach. The commission first in that context clarified that this was permissible under section 254E and kind of as suspenders that were perhaps unnecessary even in Katrina, but certainly for the reasons you've suggested Judge Garland were unnecessary here, the commission also forebore and waived 54.7. But that wasn't necessary in the context of this case. Okay, thank you. I'm sorry to interrupt your train of argument. Go ahead. No, that's quite all right, of course. What I wanted to emphasize or push back on a little bit here is the characterization of Tri-County that the commission had agreed to subsidize disaster relief using their catch phrase writ large. What the commission was doing here was not funding construction of roads or hospitals or emergency food rations. The commission was subsidizing the kinds of facilities that are necessary to provide access to critical communication services. I don't to be, unless opposing counsel says otherwise, I didn't understand them to mean food or roads. I understood them to mean access to telecommunication services. And I understood them to simply be arguing that you can't do that in a disaster, that's all. Well, and- That's why you're wrong, but I don't think that they were suggesting that you were providing roads. Assuming that understanding of their argument, Judge Garland, then I think I was also hearing in several of the questions from the court, the point that the statute doesn't anywhere include a carve out for when services are unavailable because of natural disaster. And I think that's quite right. So the commission here was serving its core function of applying the principles set forth in 254B to the particular circumstances in these particular territories. And it concluded that here, the best way to ensure access and continued access to these services was to fund upfront the kinds of facilities that would be resilient in the event of future storms. The territories, the record showed, are unusually prone to storms. Of course, they're islands. So- What about the amounts of money provided? The amounts of money provided in the stage one order, Your Honor? Stage one and stage two. I don't think there's a challenge to the amount of money in stage two, except to say, I heard counsel say today, and it's part of the briefs that the money was so large that this is going to explode the universal service fund that can't be sustained. And in response to that, I would just say, these are defined- I understand that, but maybe I misread their brief. You're saying that they're challenged to the amounts of money only related to stage one? I think they have a procedural argument as to stage one only, that the commission did not adequately explain the amount of money it chose, which was the $64.2 million that it awarded in emergency relief on a one-time basis. That argument, we have the threshold objection that as to this issue and all of the other issues in the case, besides the question of the commission's statutory authority, that Tri-County does not have standing to challenge- Okay, we are going to get to that, I promise. But as long as we're on the- we'll do it in reverse order. On the amounts first, I just want to be clear. So you don't think that they're arguing that the amounts in stage two are not supported, it's only the amounts in stage one? That's right, your honor. And what do you understand, what is the explanation for the amounts in stage one? As to stage one, the commission made what was a high-level determination based on what it saw as far as progress toward restoration from the initial immediate distribution of relief, which was of a little over $65 million,  a roughly equivalent amount of money should enable carriers to complete the remaining restoration work in a roughly equivalent amount of time. And I think in the circumstances here, that explanation was adequate. There was a real urgency to repairing these networks and the commission necessarily couldn't know for certain how much it would cost. This was one time interim relief, neither Tri-County nor anyone else has pointed to any evidence that the commission ignored or any reason to think that this number was grossly off base. And in addition, the commission didn't leave carriers with a blank check, it put in place safeguards, it specifically delineated the permitted uses of these funds, it required carriers to give certifications before and after receiving the funds, it directed the administrator of the Universal Service Fund to conduct audits. So in these circumstances, I think the commission's analysis that roughly the same amount of money would achieve the necessary remaining repair work in roughly the same amount of time was adequate. Okay, so now if we could return to what should be our first question, which is the standing argument. You argue that Tri-County doesn't have standing to challenge the stage one order, right? Yes, Your Honor. And that's because the money was from cash reserves, is that right? Yes. Is it not true that if the FCC had not used, that's a double negative, if the FCC had not used its cash reserves to pay for the stage one order, it could have used them to lower the required contributions in stage two or in the future, is that right? You're right that it could perhaps have done so, but Tri-County- Well, it would have, wouldn't it? Because the regulation 45 CFR 54.709B says, contributions for the following quarter will take into consideration the projective costs of the support mechanisms for that quarter and the excess contributions carried over from the previous quarter. I'm turning to the regulation, but I believe it also contains an exception that the commission need not do that. Yeah, so maybe not, maybe they wouldn't, but doesn't it seem likely that if they had the full amount of money already in excess, that there will be less of a contribution required thereafter, you know, the next quarter? I don't believe Tri-County has established that it's likely, and let me point you to in particular paragraph 19 of the stage one order. In paragraph 19, the commission is talking about what would happen if applicants applied for funds and a portion of these stage one funds and the agency would set aside an allotment from that pool of money for a particular carrier, but then the carrier didn't ultimately qualify as an eligible telecommunications carrier, and therefore it couldn't receive the funds. What the commission said it would do in those circumstances or that it was reserving the right to do was redirect that provider's allocation toward other universal service purposes, such as increasing the funding available for long-term rebuilding of voice and broadband networks in the territories. And so the commission was signaling that it might well increase the size of the long-term fund, the stage two fund, or it could have put that money toward other universal service contributions. So I don't- Right, but it could only put it towards the uses that are authorized by the statute. And if it already had the money for those uses, it couldn't just, it's not like it's unlimited how much they can, the FCC can increase contributions. It has to be based on a need for the money, doesn't it? That's right, your honor. I don't- If they have an extra, I don't know, billion dollars, doesn't that suggest that, yes, it's possible that there will be more needs and new needs, but there'll be a billion dollars more money available for those more needs and new needs. Perhaps, your honor, and I don't wanna belabor the point. I just want to say with respect to this amount of cash reserve, it was created by a system of uniform contributions that was a time-limited program. In the ordinary, the way the universal service program has run historically before the 2011 reforms and how it continues to operate today, collections are made based on projected demand one quarter out. So this was an unusual circumstance where there was this cash reserve and it was created by the commission in this time, for a time-limited period, to account for special needs that arose during that period. I still don't see how that has any effect on the standing argument. If you do have the money for whatever reason, the money was there, and that would reduce the amount of money needed for expenditures, no matter how many further expenditures you think you need, you still have to subtract the amount that you already have. And that suggests you don't need a new contribution for that amount, whatever it is. I think that that's not the way this would have operated necessarily. I can see that it's possible it would have operated that way. And that is just because Tri-County's contributions and the contribution factor for this program was fixed for the period through the end of 2018. And that was the period of time during which the commission contemplated using these cash reserves. So I don't think Tri-County has established a substantial likelihood that had there been no need for the funds during that period, the commission would necessarily have rolled them over to reduce the contribution factor in future quarters. But I'd maintain that at any rate, the commission's stage one order should survive on the merits. And I'm happy to address merits questions you may have. There were in the discussion of notice, I just say, I would agree Judge Garland with your point that this was not an emergency of the commission's making. And I think Judge Tatel recognized that the commission in paragraph 24 of the stage one order made clear that it was responding to an acute problem that which Tri-County does not dispute that communities in these regions lacked access to critical communications services during this period. And so the commission reasonably addressed that as an emergency and determines that the good cause exception, though narrow, applied because further delay would prevent people from having access to these necessary services. And I don't think it undermines the commission's analysis on that point that it also recognized that a new hurricane season was approaching, but the paragraph does say, and a new hurricane season was approaching. It isn't the case that the commission rested solely on that point. If there are no further questions, I'd ask that the petition be dismissed as to the stage one order, but otherwise denied. Thank you. Mr. Adamczyk, I think you were out of time, but you can have two minutes. Thank you, Your Honor. I would like to address the standing argument that the FCC's counsel brought up. Which standing argument? Are you talking about the allocation issue or the one Judge Garland was pursuing? The usage of the high cost account reserve fund. Okay. The high cost reserve fund is intended, as was previously discussed, to take excess contributions and apply them to four quarters to offset demand. If the FCC had a sufficient amount of money to do that, then it can address other issues, other initiatives. Clearly here, what happened was the FCC said by December 2018, the reserve account was depleted from all these other projects that were going on. So they weren't using it as the primary purpose of that account was. They had circumvented the primary purpose of focusing on all these other initiatives and they ran out of money in the fund. They said in 2018 that we ran out of money in the fund and we need to direct USAC going forward to make sure that there's enough contributions going forward to focus on the purposes of that fund. So by the time the stage one order was issued in May 2018, made no mention of using the high cost cash account in that order. And then three months later, they direct USAC to pay out the stage one funding from the high cost cash account. And then by the end of that year, they admitted that the funding wasn't there. So clearly it had an impact going forward on USF contributions because it wasn't being used for its primary purpose. So for that reason, the TCT has standing because the fund wasn't used to offset future contributions. And while all this was going on, future contributions skyrocketed to where now we're at. Excuse me, can you tell us the citation at the end of 2018, where they said, we've run out of money and now we need to increase contributions? Yes, your honor. I believe I have that citation in my reply brief. Okay, just tell me the page of the reply brief. That'll be sufficient. It was on, sorry, your honor. It was on page six of the reply brief. Okay, thank you. If there are no further questions, TCT requested this court reverse and vacate the SEC's decisions.  Thank you. Case is submitted.
judges: Tatel, Garland, Edwards